DARREN ROY MACK, APPELLANT, v.
ESTATE OF CHARLA MACK, RESPONDENT.

No. 49754

March 26, 2009                                        206 P.3d 98

---

[Rehearing denied May 19, 2009]

*Law Offices of Mark Wray* and *Julia Vohl Islas* and *Mark Wray*, Reno, for Appellant.

*Kreitlein & Walker, Ltd.*, and *Egan K. Walker*, Reno, for Respondent.

## OPINION

By the Court, CHERRY, J.:

In this appeal we address four issues. First, we will examine whether we may take judicial notice of the outcome of proceedings in which one spouse was adjudged to have murdered the other. Next, we will discuss whether a nunc pro tunc order[2] was appropriate in this case when one spouse died before the oral record was memorialized in an order, and we examine whether the procedure of entering the oral order nunc pro tunc was appropriate and the merits of the underlying order. We next address whether the district court issued a Qualified Domestic Relations Order (QDRO) during Charla's lifetime. Last, we will discuss the effect of the Employee Retirement Income Security Act of 1974 (ERISA) on the district court order being appealed, namely, whether the order is a QRDO under ERISA and whether ERISA preempts application of Nevada's slayer statute.

We conclude that: (1) we may take judicial notice of appellant Darren Mack (Darren) being adjudged his wife Charla Mack's (Charla) killer, (2) the nunc pro tunc order was proper to memorialize Judge Weller's oral orders, (3) the district court properly issued the QDRO during Charla's lifetime, and (4) Nevada's slayer statute

---

[2]A nunc pro tunc order is an order that is entered retroactive to a certain date.

is not preempted by ERISA. As such, we affirm the district court's order.

## *FACTS AND PROCEDURAL HISTORY*

This is an appeal of a district court's nunc pro tunc order memorializing an oral order entered by the former presiding judge, Judge Weller, in the divorce of Charla and Darren. Charla and Darren were married on May 13, 1995, in Lake Tahoe, California. Their union produced one child, Erika Nicole Mack, born on December 22, 1997. Charla filed the initial divorce complaint on February 8, 2005. Darren filed an answer and counterclaim on March 23, 2005. One of the main areas of contention between Charla and Darren was the distribution of property upon their divorce.

On January 9, 2006, the district court held a hearing on the issue of property settlement. During the hearing, the district court recited several oral orders. In part, the district court mandated that within 48 hours of the agreement being reduced to writing, Darren must pay Charla $480,000; of that amount, $50,000 was made available to be used for whatever purpose Charla desired, with the balance going towards the purchase of a vehicle and a home for herself. The district court also mandated that a QDRO was to be executed, which would result in Charla receiving spousal support from Darren's pension fund in the amount of $10,000 per month for a period of five years.

The court also entered several orders regarding certain other issues. The only issue worthy of note is as follows: releases would be signed between and among Charla, Darren's mother Joan Mack (Joan), and the entities owned by Darren and Joan—Palace, Mack & Mack I, and Mack & Mack II—waiving their respective rights to sue.

At the conclusion of the court's oral orders, Darren stated that he needed to take the agreement "to the people I'm borrowing it from and I can get it within forty-eight hours. I don't have any money." The court approved and asked that Charla's attorney, Shawn Meador, write up the agreement by January 20, 2006, so that the parties could sign it. Thereafter, the court paused the proceedings to ensure that each spouse had the opportunity to discuss the terms of the agreement with their counsel.

Finally, the court canvassed the parties as to their understanding of the court's order. Because the issue of understanding is at the heart of this appeal, we include the entire colloquy:

> THE COURT: All right.
>
> Mr. Mack, have you had an opportunity to discuss this property agreement that we've been talking about here on the record with your attorney to the full extent that you would like?

MR. MACK: Yes.

THE COURT: Do you have any remaining questions?

MR. MACK: I don't, your Honor.

THE COURT: Is there anything you wish to add?

MR. MACK: Huh-uh. No, sir.

THE COURT: Is there anything you wish to subtract?

MR. MACK: No.

THE COURT: Do you agree to be bound by this agreement?

MR. MACK: I do.

THE COURT: Ma'am?

MRS. MACK: Yes.

THE COURT: Mrs. Mack, have you heard the entire agreement spoken on the record?

MRS. MACK: I have.

THE COURT: Do you understand it?

MRS. MACK: Yes, I do.

THE COURT: Have you had an opportunity to discuss it with your attorney to the full extent that you would like?

MRS. MACK: Yes, I have.

THE COURT: Do you have any remaining questions?

MRS. MACK: Let me just check. Let me just check, look at this. (Reading.)

No.

THE COURT: Is there anything you would like to add?

MRS. MACK: No.

THE COURT: Is there anything you would like to take away?

MRS. MACK: No.

THE COURT: Do you agree to be bound?

MRS. MACK: Yes.

THE COURT: Okay.

Next the court ensured that counsel had a clear understanding of the agreement and adequately informed their clients about the agreement.

THE COURT: . . .

Counsel for Mr. Mack, have you heard the agreement?

MR. SHAW: I have, your Honor.

THE COURT: Okay.

Do you think it is in your client's best interests to enter into this agreement?

MR. SHAW: Yes.

THE COURT: Okay.

Counsel for Mrs. Mack, have you heard the entire agreement?

MR. MEADOR: I have, your Honor.

THE COURT: Do you think it's in your client's best interests to enter into this agreement?

MR. MEADOR: Yes, I do.

THE COURT: Then this agreement is accepted by the Court and shall be the order of the Court and shall be binding on the parties.

Following the hearing, each party submitted a proposed order, and the proposed orders were inconsistent with each other. Charla filed a formal objection on the record in order to preserve her objections to Darren's proposed order. Among other issues, Charla objected to Darren's post-hearing contention that he did not have authority to bind Palace or Joan to a release agreement; Charla contended that if Darren did not have the authority to make such an agreement at the time, he should not have indicated he did.

In turn, Darren's attorney, Jan Shaw, filed an affidavit in response to Charla's formal objection. In his affidavit, Shaw conceded that the parties submitted different versions of a written form of the agreement to the court and asserted that the problem was whether Joan, Palace, and the Mack & Mack entities would or would not sign waivers and releases of all claims against Charla, with Charla waiving the same. Moreover, Shaw attested that, ''[t]he parties have done all that they are required to do, and your Affiant believes both assume this case is settled. Certainly it is the belief of [Darren] that this case is settled; that there is a binding agreement between the parties that he is to honor.'' Finally, Shaw contended that, ''all the Plaintiff [Charla] had to do was get appropriate releases and waivers to counsel for the non-parties, do so promptly, and determine whether or not they were going to be executed . . . [Charla's contentions have] nothing to do with the Defendant [Darren] who wanted this case settled, who believes it is settled, and who is prepared to comply with the settlement.''

Thereafter, Charla filed an emergency motion for order to show cause or, in the alternative, to enforce the settlement agreement, motion for order shortening time to respond, and a motion for an award of attorney fees and costs. In her motion, Charla argued that Darren was carrying out the exact threat he previously posed to her, which was to create delay and problems post-settlement and to force Charla to spend as much as possible out of the settlement awards on attorney fees and costs. Further, Charla argued that there was no support in the record that the responsibility for procuring waivers from Joan, Palace, and the Mack & Mack entities was Charla's obligation, although she diligently pursued obtaining the waivers.

Darren responded via another affidavit filed by Shaw on February 15, 2006. Darren contended that the proposed written orders of both parties clearly stated that the waivers are an issue between Charla and the third parties of Joan, Palace, and the Mack entities, without Darren's involvement.

Thereafter, several motions were filed by both parties. Charla filed a notice of acceptance of settlement and request for entry of order. In her motion, Charla asked that the court finalize the settlement, with Charla agreeing to waive the requirement that Joan and Palace dismiss their lawsuits[3] and, in turn, Charla would reserve any claims or defenses she may have against Joan and Palace because they seemed unwilling to enter into mutual waivers and releases. However, Charla also offered that if Joan and Palace were willing to sign the releases, she would honor that part of the agreement and in turn execute waivers. Darren filed an objection to Charla's request for entry of order on the basis that: (1) the offer of settlement was an earlier version of a settlement offer that was no longer in Darren's best interest; (2) the motion did not comply with the Nevada Rules of Civil Procedure, the District Court Rules, or the Local Rules of Practice for the Second Judicial District Court as to motion pleading; and (3) the court was without jurisdiction to issue the requested relief based on caselaw. Charla thereafter replied, refuting Darren's claims.

The district court held a hearing regarding the issues hindering settlement on May 24, 2006. At this hearing, Judge Weller reaffirmed his oral order of January 9, 2006. As to the issue regarding settlement of claims between Charla and Joan, Palace, and the Mack & Mack entities, the court stated that it read the settlement to be as follows:

> That there's a requirement that Mrs. Mack, the mother, the grandmother, drop [the] pending lawsuit, she's testified twice today under oath her willingness to do that.
>
> I also read that language to say that Mr. and Mrs. Mack are granting each other as part [of] the settlement a full and final settlement of all their financial rights and obligations arising out of their relationship, marital or otherwise.
>
> I also read that language as saying that Mrs. Mack, the litigant, Charla Mack, will not initiate any lawsuit against Mr. Mack's mother or the business, which I understand to be Palace.
>
> And I'm willing to consider that more broadly if the parties agree that that includes Mack & Mack I, I don't think I knew at the time [of] the settlement of the existence of Mack &

---

[3]The record does not include any documents regarding lawsuits filed by Joan or Palace against Charla. However, based on this motion, it appears that Charla had entered into some agreement whereby Joan and Palace agreed to drop the lawsuits that they had filed against Charla.

Mack I, I don't recall it specifically, or Mack & Mack II, or the mother alluded to the southern properties that might be in another entity. But what I understand that language on Page 13 to say is that Mrs. Mack, Charla Mack, is not going to initiate a lawsuit against anyone involved in Palace or Mr. Mack or anyone.

I don't read it as saying that she can't respond to a lawsuit or counter-claim if she is sued, but I do read it as saying that she is not going to initiate a lawsuit.

In relation to Mr. Mack's obligation, I very specifically remember Mr. Mack leaving this courtroom in the negotiation, probably before we were on the record, we were talking about the deal that we had reached and put on the record, and he went outside to find out if it was okay to enter into the agreement, and he came back and he entered into the agreement.

I read the language on Page 13 of the transcript to say that Mr. Mack will use his best effort to ensure that the business and his mother will not sue Charla Mack. They were the only parties here, and I read that language to talk about the agreement between the only parties who were here.

And I think that that also, best efforts is one way of expressing it, another way of expressing it is in every contract in Nevada is an implied covenant of good faith and fair dealing. And I read that language to require Mr. Mack to in good faith and in fair dealing to do everything he could to keep the business and his mother from initiating a lawsuit against Charla Mack.

I also read that page—the language on that page as saying that by saying that it resolves all claims among the business, the mother, Mr. Mack and Mrs. Mack, I read that as meaning to the extent of the parties who were in the courtroom and made that agreement on the record have within their control, that it didn't obligate them to do anything that was impossible, and it didn't obligate anybody who wasn't part of the agreement to do anything at all.

Although, I took what Mr. Mack said in the courtroom to be his representation on behalf of those other parties, they weren't party to the agreement, and the only parties who were bound were Mr. and Mrs. Mack, and it obligated them to the extent that—specifically Mr. Mack to the extent that he was able to obtain the cooperation to his mother and the business.

I also find that the language for the release was for her benefit, and I guess this is redundant because this is part of your argument to Mr. Meador that I told you I'd adopt.

I think the best thing I can do for you is to set a hearing date on the custody issues and get them over with as quickly as possible. As I stated to you earlier, if you don't like what I do on custody it's easy to turn that around.

The court also resolved another issue at Darren's request—to know Charla's physical address on the basis that he should know where Erika was living. Charla argued in part that she should not have to reveal her address to Darren because "[Darren] gets so angry and so worked up that I just don't feel comfortable right now of him knowing personally where I live." The court offered Charla the options of either obtaining a temporary restraining order or petitioning the secretary of state's office to obtain a fictitious address for all court proceedings. At the end of the hearing, Charla disclosed her address to Darren on the record and the court ordered that neither party, nor an agent of either party, was to be within 100 yards of the other except during custody exchanges, nor would there be any interference with the other party electronically via telephone or e-mail.

On June 12, 2006, Charla was killed, and Judge Weller was shot.[4] Darren was later convicted of both Charla's murder and the attempted murder of Judge Weller. On September 19, 2006, the district court issued an order allowing the Estate of Charla Mack (the Estate) to substitute for Charla in the remainder of the divorce proceedings. Thereafter, on December 5, 2006, the Estate filed a motion for entry of an order nunc pro tunc, seeking to have the oral orders entered by Judge Weller at the hearings on January 9, 2006, and May 24, 2006, codified in a written order.

The Estate made three main arguments in support of its motion. First, the Estate argued that Charla had a property interest in Darren's retirement benefits and business holdings because they were community assets, therefore, belonging in half to her per statutory authority. Second, the Estate argued that it had a valid claim to her property because an action for divorce survives the death of a party insofar as property distribution issues remain following the death. Finally, the Estate argued that the settlement agreement agreed upon on January 9, 2006, was valid and enforceable as ruled by Judge Weller, and therefore a nunc pro tunc order must be memorialized.

Darren filed an opposition to the motion for entry of an order nunc pro tunc along with a motion to dismiss. Darren argued that a nunc pro tunc order was not appropriate because: (1) the district court did not have jurisdiction to force a settlement on terms to which Darren never agreed; (2) there was no agreement because there was no meeting of the minds on a material term (specifically, the release agreements); (3) even if there was an enforceable settlement agreement, one of the terms of the agreement included settlement with third parties, and that specific condition precedent never occurred; (4) the district court lacked the authority to alter the settlement by eliminating the condition regarding resolution of third-

---

[4]We note that Judge Huff assumed responsibility for this case after these events.

party claims; (5) the district court had no jurisdiction to issue an order affecting Darren's ERISA-qualified pension plan; and (6) Darren objected to the admissibility of evidence concerning alleged community property interests. As to his motion to dismiss, Darren argued that the divorce action must be dismissed upon the death of one of the parties, inclusive of all property rights as they are incidental to a final decree.

The Estate filed a reply to Darren's opposition along with an opposition to Darren's motion to dismiss. In its opposition to the motion to dismiss, the Estate argued that Nevada has long recognized that although the divorce decree becomes a nullity upon a party's death, property issues do not abate at death, contrary to Darren's contentions. Additionally, the Estate noted that there was a decision on the merits of this case, and the decision was deemed enforceable, and therefore a nunc pro tunc is appropriate. The Estate made the following reply arguments as to the pending motion for an order nunc pro tunc: (1) an order nunc pro tunc must be entered in this case to reflect the decision rendered by the court; (2) the enforceability of the settlement agreement had already been adjudicated at the May 24, 2006, hearing and need not be addressed; and (3) the district court had jurisdiction to issue orders affecting ERISA-qualified pension plans.

Thereafter the district court entered an order nunc pro tunc. In its order, the district court relied on our opinion in *Finley v. Finley*, 65 Nev. 113, 118, 189 P.2d 334, 336 (1948), *overruled on other grounds by Day v. Day*, 80 Nev. 386, 395 P.2d 321 (1964), for authority to enter an order nunc pro tunc to render the record truthful as to the acts done or intended to be done by the district court without changing the actual judgment rendered. Further, the district court found that, based on the January 9, and May 24, 2006, hearings, the facts were clear that Judge Weller made a decision on the facts of the case concerning the property settlement and would have signed an order immediately had a written order been available.

Some of the facts that the district court found persuasive in its finding that a factual basis for a nunc pro tunc order existed are: (1) Judge Weller's canvass of the parties and the parties' subsequent agreement to the settlement, (2) Judge Weller's statement on the record that the settlement "shall be the order of the court," (3) Judge Weller's assignment to Charla's attorney at both hearings to draft the order for his signature and filing, and (4) Judge Weller's statement on the record that if the parties were unhappy with his ruling they were free to appeal to the Nevada Supreme Court. Based on these factual findings and pursuant to *Finley*, the district court found that an actual order was entered by the court, and therefore it granted the Estate's motion and entered an order nunc pro tunc. Darren has timely appealed.

## DISCUSSION

Darren raises several issues on appeal. Because of the applicability to the other issues raised by Darren, we begin by considering whether we may take judicial notice of the fact that Darren was adjudged Charla's killer. We will then address whether the entry of a nunc pro tunc order was proper in this case and whether the merits of that order were valid. Next, we will address whether the district court properly issued a valid QDRO. Last, we will address the applicability of Nevada's slayer statute to ERISA.

### Judicial notice

Darren argues that events that occurred in his criminal proceedings and events that occurred after the filing of this appeal are not matters of the record in this appeal. As such, he contends that this court may not consider these matters.

On appeal, a court can only consider those matters that are contained in the record made by the court below and the necessary inferences that can be drawn therefrom. *Toigo v. Toigo*, 109 Nev. 350, 350, 849 P.2d 259, 259 (1993) (citing *Lindauer v. Allen*, 85 Nev. 430, 433, 456 P.2d 851, 853 (1969)). We will generally not consider on appeal statements made by counsel portraying what purportedly occurred below. *Wichinsky v. Mosa*, 109 Nev. 84, 87, 847 P.2d 727, 729 (1993) (citing *Lindauer*, 85 Nev. at 433, 456 P.2d at 852-53).

However, we may take judicial notice of facts generally known or capable of verification from a reliable source, whether we are requested to or not. NRS 47.150(1). Further, we may take judicial notice of facts that are ''[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, so that the fact is not subject to reasonable dispute.'' *See* NRS 47.130(2)(b).

As a general rule, we will not take judicial notice of records in another and different case, even though the cases are connected. *Occhiuto v. Occhiuto*, 97 Nev. 143, 145, 625 P.2d 568, 569 (1981) (citing *Giannopulos v. Chachas*, 50 Nev. 269, 270, 257 P. 618, 618 (1927)). However, this rule is flexible in its application and, under some circumstances, we will invoke judicial notice to take cognizance of the record in another case. *Id.*

To determine if a particular circumstance falls within the exception, we examine the closeness of the relationship between the two

cases. *Id.* We have taken judicial notice of other state court and administrative proceedings when a valid reason presented itself. *See, e.g.*, *id.*; *Cannon v. Taylor*, 88 Nev. 89, 92, 493 P.2d 1313, 1314-15 (1972); *State Farm Mut. v. Comm'r of Ins.*, 114 Nev. 535, 539, 958 P.2d 733, 735 (1998).

Because Darren's murder trial occurred after the nunc pro tunc order was issued, the record on appeal is silent regarding the person responsible for Charla's death. As such, Darren contends that we cannot take judicial notice of the outcome of his murder trial for Charla's death and its application to this appeal as it relates to the ERISA pension plan.

We hold that judicial notice may be taken of the outcome of a murder trial in which the deceased stood to gain financially from the killer because of the close relationship between the murder trial and the benefits to which the deceased's estate is entitled. This relationship is close and serious enough that the legislature of almost every state has addressed it in state slayer statutes, which prohibit a person's financial gain from their own wrongdoing in taking the life of another.[5] Based on this close relationship, we conclude that these particular circumstances fall within the exception and that we may take judicial notice of the outcome of Darren's murder trial for Charla's death because it falls within the exception to the general rule of judicial notice, as Charla stood to gain financially from Darren's ERISA pension plan.

## The nunc pro tunc order

Darren argues that the district court's nunc pro tunc order should not be upheld because the entering of such an order was not appropriate and that the district court's underlying decision was invalid. We disagree.

The grant or denial of an order nunc pro tunc is within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Allen v. Allen*, 70 Nev. 412, 415, 270 P.2d 671, 672 (1954).

### Entering the nunc pro tunc order was appropriate

Darren argues that the nunc pro tunc order entered by the district court does not meet the standard for issuance of such an order because the Estate did not allege a clerical error, nor did it seek to amend a prior judgment. Rather, the Estate sought to create a written order where none existed before and to modify that order from that which was previously part of the record. Specifically, Darren

---

[5]Nevada's slayer statute will be discussed later in this opinion.

contends that because Judge Weller did not enter a written order from the January 9, 2006, hearing, there was no order for the district court to amend nunc pro tunc.

The purpose of an order nunc pro tunc is to "make a record speak the truth concerning acts done." *Finley v. Finley*, 65 Nev. 113, 118, 189 P.2d 334, 336 (1948) (citing *Talbot v. Mack*, 41 Nev. 245, 255, 169 P. 25, 27 (1917)), *overruled on other grounds by Day v. Day*, 80 Nev. 386, 395 P.2d 321 (1964). Further, we have held that

> an order nunc pro tunc cannot be made use of nor resorted to, to supply omitted action. Power to order the entry of judgment nunc pro tunc cannot be used for the purpose of correcting judicial errors or omissions of the court. Nor can this procedure be employed to change the judgment actually rendered to one which the court neither rendered nor intended to render.

*Finley*, 65 Nev. at 118, 189 P.2d at 336 (citing *Wright v. Curry*, 187 S.W.2d 880, 881 (Ark. 1945); *Schroeder v. Superior Court*, 239 P. 65, 66 (Cal. Ct. App. 1925)).

The nunc pro tunc order entered by the district court was used to memorialize the oral records from the hearings held on January 9, 2006, and May 24, 2006. As such, and because the nunc pro tunc order was not used for any of the purposes we previously disapproved of in *Finley*, we conclude that the nunc pro tunc order meets the standard for issuing such an order. We further conclude that the district court did not abuse its discretion in entering this order because it was not used to supply omitted action, nor to correct judicial errors or an omission of the court or to change the judgment actually rendered. As noted, the nunc pro tunc order here was used to memorialize the oral orders made on the record by Judge Weller.

Darren also contends that the case relied upon by the district court, *Koester v. Estate of Koester*, 101 Nev. 68, 693 P.2d 569 (1985), is distinguishable from this case. Instead, Darren contends that this case should be adjudicated in the same manner as *McClintock v. McClintock*, 122 Nev. 842, 138 P.3d 513 (2006).

In *Koester*, 101 Nev. at 70-71, 693 P.2d at 571, the district court entered a nunc pro tunc order memorializing a decree of divorce, which was not filed before Mrs. Koester's death. We held that, because Mrs. Koester had died after the district court entered its decision, the district court had the power to enter the judgment nunc pro tunc after Mrs. Koester's death. *Id.* at 71-72, 693 P.2d at 572. Further, we also adopted the general principle regarding relating back a final divorce decree following the death of one party. *Id.* at 73-74, 693 P.2d at 572. Specifically, we stated that a district court could properly relate back a divorce decree to a point in time before

the death of one of the parties "[i]f the facts justifying the entry of a decree were adjudicated during the lifetime of the parties to a divorce action, so that a decree was rendered or could or should have been rendered thereon immediately, but for some reason was not entered as such on the judgment record . . . ." *Id.* at 73, 693 P.2d at 572.

In *McClintock*, 122 Nev. at 843, 138 P.3d at 514, we held that a district court could not enter a nunc pro tunc order to change the date of a divorce to a date prior to the date the district court entered its decision. We thus concluded that "[t]he district court abused its discretion by moving the date of the . . . divorce decree, nunc pro tunc, to a date before the district court's adjudication of the matter." *Id.* at 846, 138 P.3d at 516.

Darren argues that *Koester* is distinguishable because the nunc pro tunc order involved in that case served to validate a decree of divorce that was voidable based solely on the date entered on the original order following Mrs. Koester's death. Darren argues that the district court abused its discretion and violated our holding in *McClintock*, 122 Nev. at 843, 138 P.3d at 514, by backdating the nunc pro tunc order. Based on our reading of these two cases, we disagree with Darren's contentions because the district court did not change the divorce decree.

It was not the case here, as it was in *McClintock*, that the district court changed the date the divorce decree was entered. As such, we conclude that, as in *Koester*, the district court did not abuse its discretion because the district court used the nunc pro tunc order to relate back to the hearings held on January 9, 2006, and May 24, 2006, where the divorce decree was adjudicated and entered orally on the record by Judge Weller.

### *The merits of the order were valid*

Darren contends that even if the nunc pro tunc procedure was proper, the order constituted an abuse of discretion because the district court did not apply the law to the facts shown by the record in the divorce case. Darren specifically argues that the merits of the order entered by the district court were invalid because there was no meeting of the minds to support the settlement agreement and the condition precedent of obtaining waivers was not met.

First, Darren argues that the underlying decision of the district court to grant the nunc pro tunc order was an abuse of discretion because the settlement agreement memorialized in the order was invalid and not enforceable. Darren specifically contends that the settlement agreement was invalid because there was no meeting of the minds as to a material term of the agreement. That is, the execution of release agreements between and amongst Charla, Joan, Palace,

and the Mack & Mack entities did not lead to a meeting of the minds.

■■■■ ■ ■

"Contract interpretation is subject to a de novo standard of review." *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005) (citing *Diaz v. Ferne*, 120 Nev. 70, 73, 84 P.3d 664, 665-66 (2004); *Grand Hotel Gift Shop v. Granite St. Ins.*, 108 Nev. 811, 815, 839 P.2d 599, 602 (1992)). "However, the question of whether a contract exists is one of fact, requiring this court to defer to the district court's findings unless they are clearly erroneous or not based on substantial evidence." *May*, 121 Nev. at 672-73, 119 P.3d at 1257 (citing *James Hardie Gypsum, Inc. v. Inquipco*, 112 Nev. 1397, 1401, 929 P.2d 903, 906 (1996), *overruled on other grounds by Sandy Valley Assocs. v. Sky Ranch Estates*, 117 Nev. 948, 955 n.6, 35 P.3d 964, 968-69 n.6 (2001)).

■■■■ ■

A settlement agreement, which is a contract, is governed by principles of contract law. *May*, 121 Nev. at 672, 119 P.3d at 1257. As such, a settlement agreement will not be an enforceable contract unless there is "an offer and acceptance, meeting of the minds, and consideration." *Id.* (citing *Keddie v. Beneficial Insurance, Inc.*, 94 Nev. 418, 421, 580 P.2d 955, 956 (1978) (BATJER, C.J., concurring)).

We conclude that, based on Darren's clear assent to the terms of the settlement agreement at the hearings held by Judge Weller on January 9, 2006, and May 24, 2006, substantial evidence exists that shows a meeting of the minds between the parties. As such, we affirm the order of the district court with respect to the settlement agreement because the record indicates an understood settlement between the parties.

■■■■ ■

Second, Darren argues that Joan, Palace, and the Mack & Mack entities' signatures on the waivers were a condition precedent to the valid execution of the settlement agreement, and because the condition was never met, the settlement agreement cannot be enforced. Darren further argues that the district court was without any legal authority to alter the terms of the settlement agreement because a settlement is a matter of a private contract between two parties. *See Travis v. Nelson*, 102 Nev. 433, 434, 725 P.2d 570, 571 (1986). Likening the instant case to *Travis*, Darren argues that the district court should have determined there was no settlement between the parties rather than allow the court's own frustration with the parties to take over and improperly substitute the court's judgment. Accordingly, Darren argues that the district court's elimination of the settlement provision, which called for waivers to be signed between

and among Charla, Joan, Palace, and the Mack & Mack entities, effectively subjected Darren to paying approximately $1 million to Charla without Darren receiving the important benefit of the bargain for which he entered.

In *Travis*, 102 Nev. at 434, 725 P.2d at 571, we held that a district court did not have the authority to alter the terms of an agreement. Further, we stated that a district court did have the authority to approve terms of an agreement, which were beneficial to an estate, but could not order the parties to agree to a settlement that included terms which were not agreed upon. *Id.*

Because Darren acquiesced to the terms of the settlement agreement on the record at the hearings on January 9, 2006, and May 24, 2006, and because the determination by the district court that the waiver terms were not a condition precedent was not clearly erroneous, we conclude that the waivers were not an unmet condition precedent and the agreement should be enforced. As such, the district court did not alter the terms of the settlement agreement but merely accepted the terms that were already approved of by both parties.

*The district court issued a valid QDRO*

Darren contends that the district court erred in issuing a QDRO to Charla's estate because the QDRO was issued in violation of ERISA. Darren points out that under ERISA, in order for Charla to collect from his pension plan, she was required to obtain a valid QDRO. However, Darren contends that ERISA precludes Charla from receiving payments from his retirement account because she does not qualify as an alternate payee. Darren further argues that in order for there to be a QDRO, the court must issue a domestic relations order (DRO) and the plan administrator must then determine if it is qualified. Because the district court never signed a DRO, Darren argues that the administrator had nothing to qualify.

Whether an order "constitutes a valid QDRO under ERISA is a question of law." *Branco v. UFCW-Northern California Employers*, 279 F.3d 1154, 1158 (9th Cir. 2002) (citing *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1150 n.5 (9th Cir. 2000)). We review questions of law de novo. *Sheriff v. Burcham*, 124 Nev. 1247, 1253, 198 P.3d 326, 329 (2008).

ERISA provides protection for beneficiaries of employee pension and welfare benefit plans offered in the private workplace. ERISA includes a "spendthrift" provision, restricting a plan participant's ability to assign his or her benefits under a pension plan covered by this act. 29 U.S.C. § 1056(d)(1) (2006). ERISA expressly preempts state law and makes the regulation of pension plans a matter of exclusive federal interest. *Id.* § 1144(a).

Because concerns that ERISA's spendthrift and preemption provisions affected the validity of state court DROs, Congress enacted the Retirement Equity Act of 1984 to exempt QDROs from those provisions. *Id.* § 1056(d)(3)(A). Congress provided that the spendthrift provision "shall not apply if the order is determined to be a qualified domestic relations order [QDRO]." *Id.* Consistent with this language, Congress added an exception to the express ERISA preemption provision, stating that the preemption provision "shall not apply to [QDROs]." *Id.* § 1144(b)(7). Under a QDRO, an alternative payee is treated as a plan beneficiary. *Id.* § 1056(d)(3)(J).

A DRO is "qualified" if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." *Id.* § 1056(d)(3)(B)(i)(I). The QDRO provisions define "alternate payee" to mean "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." *Id.* § 1056(d)(3)(K).

The district court issued a valid QDRO during Charla's lifetime. In the January 9 hearing, Judge Weller stated that within 48 hours, "a QDRO will be executed which will transfer to Mrs. Mack the sum of five hundred thousand dollars with any appreciation that is distributed to that five hundred thousand dollars and more or less equal installments over a period of five years." Here, the court issued a QDRO, because Judge Weller's oral order created a recognized existence in Charla, the right to receive a portion of Darren's ERISA pension plan. *See id.* § 1056(d)(3)(B)(i)(I). Because the district court issued a DRO, which was qualified, and it recognized Charla as an alternate payee with the right to receive a $500,000 payment from Darren's ERISA pension plan, we conclude that the QDRO was valid and affirm the order of the district court.

*Slayer-beneficiaries cannot benefit from their wrongdoing in the ERISA context*

As we have determined that we may take judicial notice of the fact that Darren has been adjudged to have murdered Charla, the issue now becomes whether Darren may benefit from his murderous act and not have to pay Charla's estate the lump-sum payment from his ERISA pension plan. We have decided to address this issue because of the grave importance it presents to the functioning of Nevada's slayer statute. Because we conclude that Nevada's slayer statute does not fall within the category of laws that have been recognized as preempted by ERISA, we hold that Darren cannot benefit from his wrongdoing and stop Charla's estate from obtaining payments from his ERISA-qualified pension plan.

Darren argues that the district court created a fiction by back-dating the "settlement agreement" by a year and a half. Darren claims that the district court had to do so because, otherwise, his order would violate ERISA law and the federal preemption doctrine.

Whether a state law is preempted by a federal statute is a question of Congressional intent. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987). While it is an issue of first impression in Nevada, several federal district courts have determined that Congress did not intend ERISA to preempt state laws that prohibit murderers from reaping financial benefits because of their crimes. *See, e.g., Mendez-Bellido v. Bd. of Tr. of Div. 1181, A.T.U.*, 709 F. Supp. 329, 331 (E.D.N.Y. 1989); *Atwater v. Nortel Networks, Inc.*, 388 F. Supp. 2d 610, 614 (M.D.N.C. 2005); *Connecticut Gen. Life Ins. Co. v. Riner*, 351 F. Supp. 2d 492, 497 (W.D. Va. 2005); *UNUM Ins. Co. of America v. Locke*, No. 2:06 CV 0861, 2006 WL 2457106 (W.D. La. Aug. 22, 2006); *Administrative Committee for the H.E.B. v. Harris*, 217 F. Supp. 2d 759, 761 (E.D. Tex. 2002); *New Orleans Elec. Pension Fund v. Newman*, 784 F. Supp. 1233, 1236 (E.D. La. 1992). Today, we approve of the holdings of these courts and adopt the framework set out in *Mendez-Bellido*. 709 F. Supp. at 331.

State laws that " 'relate to any employee benefit plan' " are preempted by ERISA. *Mendez-Bellido*, 709 F. Supp. at 331 (quoting 29 U.S.C. § 1144(a)). In the context of ERISA, "[t]he words 'relate to' must be interpreted broadly to effectuate Congress' purpose of 'establish[ing] pension plan regulation as exclusively a federal concern.' " *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983)). While there is no concrete rule to determine whether a state law is preempted by ERISA, the United States Court of Appeals for the Second Circuit provided some guidance in *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir. 1989), when it stated that

> [W]e find that laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.

We conclude that the Nevada slayer statute is not preempted by ERISA, as the application of this statute will not affect the determination of an employee's eligibility for benefits, *compare Gilbert v. Burlington Industries Inc.*, 765 F.2d 320, 327 (2d Cir. 1985), or the

impact on the method of calculating benefits due. *See Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 829-30 (1988).

At common law, convicted murderers were not stopped from benefiting from their wrongful acts and were able to inherit from the estate of the person whom they had killed. *Holliday v. McMullen*, 104 Nev. 294, 296, 756 P.2d 1179, 1179 (1988). However, we have noted that "[s]tate legislatures, rightfully resolving that killers should not profit from their heinous deeds, began passing laws that have come to be known as slayer statutes." *Id.*

The Nevada slayer statute, NRS 41B.200, provides that a killer cannot profit or benefit from his wrong. NRS 41B.200(1) states that "[n]otwithstanding any other provision of law, the provisions of this chapter apply to any appointment, nomination, power, right, property, interest or benefit that accrues or devolves to a killer of a decedent based upon the death of the decedent."

Since we hold that the Nevada slayer statute is not preempted by ERISA, it follows that Darren should not be allowed to benefit from his wrongdoing in murdering Charla. As such, we affirm the order of the district court with respect to the settlement agreement that gave Charla a lump-sum payment from Darren's ERISA pension plan.

## CONCLUSION

We conclude that we may take judicial notice of the outcome of a murder trial in which the deceased stood to gain financially from her killer because of the close relationship between the murder trial and the benefits to which the deceased's estate is entitled.

Futher, the district court did not abuse its discretion in entering the nunc pro tunc order to memorialize the oral records made at the hearings of January 9, 2006, and May 24, 2006, because the entering of the nunc pro tunc order was proper and the district court's underlying basis for issuing the order was valid.

Also, we conclude that the district court properly issued a QDRO during Charla's lifetime which gave Charla a recognized right to receive a portion of Darren's ERISA pension plan.

Finally, because we hold that Nevada's slayer statute is not preempted by ERISA, Darren may not benefit from his wrongful act of killing Charla. Thus, we affirm the order of the district court with respect to the lump-sum payment to Charla from Darren's ERISA pension plan.

PARRAGUIRRE, DOUGLAS, SAITTA, and GIBBONS, JJ., concur.