IN THE MATTER OF PARENTAL RIGHTS AS TO
S.M.M.D. AND T.A.D.

RAENA R., APPELLANT, *v.* STATE OF NEVADA; TED R.;
AND RAELYNN R., RESPONDENTS.

No. 55541

January 26, 2012                                272 P.3d 126

*Donald K. Pope*, Reno, for Appellant.

*Catherine Cortez Masto*, Attorney General, and *Sharon L. Benson*, Deputy Attorney General, Carson City, for Respondent State of Nevada.

*Ernest E. Adler*, Carson City, for Respondents Ted R. and Raelynn R.

## OPINION

By the Court, PICKERING, J.:

This appeal requires us to decide whether, under section 1919 of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (2006), a tribal-state agreement respecting child custody proceedings may vest a Nevada district court with subject matter jurisdiction to take a relinquishment of parental rights under circumstances where section 1911(a) of the ICWA, 25 U.S.C. § 1911(a), would otherwise lay exclusive jurisdiction with the tribal court. We conclude that the ICWA, in keeping with fundamental principles of tribal autonomy, allows for tribal-state agreements for concurrent jurisdiction even when the tribe would have exclusive jurisdiction absent an agreement. Therefore, we affirm.

### I.

This case has a long history. In September 2002, the social services division of the Fallon Paiute Shoshone Tribe (the tribe) removed S.M.M.D. and T.A.D. (the children) on an emergency basis from their mother Raena, who lived on the reservation with them and is a member of the tribe. Tribal social services returned the children to Raena but their situation did not stabilize. In July 2003, Nevada Department of Child and Family Services (DCFS) and tribal social services undertook a joint investigation of the children's welfare; this culminated in the tribe removing the children for a second time in December 2003. Because the children did not meet the tribe's then-applicable blood quantum requirement for membership, tribal social services ceded custodial oversight to DCFS.

The children were returned to Raena but renewed concern for the children's welfare led tribal social services and DCFS to con-

duct a second joint investigation. In December 2004, this investigation ended like the first, with DCFS entering the reservation with the tribe's permission and taking custody of the children; in January 2005, child welfare dependency proceedings were brought in state court. DCFS and the district court established a case plan for Raena but placed the children with foster parents Tim and Mayris T. of Fallon (the foster parents). The court held periodic reviews to monitor the children and to measure Raena's progress. Each time, the district court reassessed the ICWA's applicability and, until January 2006, concluded that the tribe did not have jurisdiction over the children because they did not meet its blood quantum requirements for eligibility.

Some time before January 2006,[1] the tribe changed its blood quantum requirements. This change made the children eligible for tribal membership and brought them within the purview of the ICWA. In January 2006, the district court determined that the children were "Indian children" subject to the ICWA, 25 U.S.C. §§ 1901-1963, and it found that Raena had failed to make "normal parental adjustments." DCFS decided to pursue termination of her parental rights.

Coordination between tribal social services and DCFS continued. DCFS notified the tribe that it was pursuing termination of Raena's parental rights and invited the tribe to intervene. Interim tribal social services director Melanie Arragon replied that the tribe was willing to address parental rights but that "if this process ha[d] already begun with the state the tribal social services would like the process to continue." The tribal court issued an order in February 2006 declaring the children wards of the tribe but that the tribe's "legal and physical custody" of the children was "concurrent with the State of Nevada [and DCFS]" and "the current plan and placement of [the children] is appropriate and approved to address termination of parental rights."

The process continued in state court, with DCFS social worker Rhonda Felix and tribal social services director Bonnie Rushford maintaining the state-tribal communication. Felix attended at least two meetings with the tribe and made several appearances in tribal court. In June 2006, DCFS notified the district court that "[a] joint decision [had been] made to continue with the Division of Child and Family Services maintaining jurisdiction with the Fallon

---

[1]The precise date of the change in eligibility requirements is not clear. However, the evidence indicates that the change occurred at the latest by January 2006. The district court was aware of the children's eligibility by then and DCFS and tribal social services communicated by letter about the tribe's intentions regarding jurisdiction that month. The children were enrolled as members of the Paiute Shoshone Tribe of the Fallon Reservation on March 14, 2006.

Paiute Shoshone Tribal Social Services being a co-agent and lending support.''

In December 2006, DCFS petitioned the district court to terminate Raena's parental rights over the children. Its petition advised that ''[u]pon a termination of parental rights hearing being set the Fallon Paiute Shoshone Tribal court will schedule a Status hearing to receive an update on what is occurring. . . .'' And in January 2007—as DCFS predicted—the tribal court held a status hearing. The tribal court determined that the tribe and state maintained concurrent ''legal and physical custody'' over the children and that the ''current plan and placement of [the children] . . . is appropriate'' and it ''approved'' the ''termination petition . . . proceeding in the state court.''

The termination hearing proceeded in state court on March 5, 2007. Raena attended with counsel. Before the hearing concluded and after consulting with her counsel, Raena elected to voluntarily relinquish her parental rights. The district court canvassed Raena to ensure that her relinquishment was knowing, voluntary, and free of undue influence. The court accepted the voluntary relinquishment, also terminated the father's parental rights, and placed the children with DCFS. In June 2007, the district court ordered that ''legal and physical custody of [the children] be returned to the Fallon Paiute Shoshone Tribal Social Services.'' The tribal court then entered an order accepting ''all jurisdiction over these proceedings.''[2] In March 2008, the tribal court, after a hearing, ordered the adoption of S.M.M.D. and T.A.D. to respondents Ted and Raelynn R.

When Raena relinquished her parental rights, she had assumed that the children's foster parents would become their adoptive par-

---

[2]The record on appeal includes tribal court documents that were not before the district court. Although this court generally will not consider documents not part of the record below, *Toigo v. Toigo*, 109 Nev. 350, 350, 849 P.2d 259, 259 (1993), these documents would be appropriate subjects for judicial notice, if they were complete and adequately authenticated, *see* NRS 47.130, NRS 47.150; *Mack v. Estate of Mack*, 125 Nev. 80, 91, 206 P.3d 98, 106 (2009), but they are not.

We note in particular the motion to dismiss that asserts that, after the briefing was completed in this case, the tribal court, on remand from the tribal appeals court, rejected Raena's parallel challenge to the state court's termination order. If established—the record is incomplete—such a ruling would lead us to the same conclusion, albeit on alternative grounds, to wit: (1) either the state courts are wholly without jurisdiction to address custody further, the tribe having exercised jurisdiction over it; or (2) the tribe's decision as to the validity of the parental rights termination commands full faith and credit, under 25 U.S.C. § 1911(d). Because the record on appeal of the tribal court decisions and arguments made there is insufficient for this court to adequately assess these arguments and further delay and litigation in this matter is unfair to the participants, especially the children, we affirm based on 25 U.S.C. § 1919.

ents. Disappointed that they did not, Raena returned to state district court and asked that court to set aside her relinquishment under ICWA, 25 U.S.C. § 1914. She maintained that the district court had not had jurisdiction to take her relinquishment, invalidating it.[3] The district court heard arguments and denied the petition. It found that "Tribal Social Services and State Social Services were in agreement that the Termination of Parental Rights should proceed in State District Court and the placement and adoption of the children, if necessary, would proceed in the Tribal Court." Ultimately, the district court determined that it was not a court of competent jurisdiction under section 1914 to void the termination.

Raena appeals the district court's denial of her petition.

## II.

Raena presents three arguments for invalidating the district court's taking of her relinquishment. First, she argues that the tribe had jurisdiction under 25 U.S.C. § 1911(a), and there was no tribal-state agreement to give the state court jurisdiction to take the termination of her parental rights. Second, she proposes a statutory argument that, even if a tribal-state agreement existed, such an agreement cannot provide a state court's sole basis for jurisdiction over Indian children; in essence she argues that if jurisdiction is exclusive to the tribe under section 1911(a), the tribe cannot share that jurisdiction with the state under section 1919. Third, she argues that the district court's termination proceeding disregarded the ICWA's tribal and parental notice requirements, see 25 U.S.C. § 1912, and NRS Chapter 62B's ICWA notice requirements.

## A.

Before reaching the merits of Raena's arguments, we must resolve two threshold challenges mounted by the State and the adoptive parents (collectively, the State).

The State's first challenge is jurisdictional. Citing In re M.M., 65 Cal. Rptr. 3d 273, 281 (Ct. App. 2007), in which a California Court of Appeal held that it could not hear the appeal from an order transferring jurisdiction from a state to a tribal court because the transfer divested all California courts of jurisdiction to amend the order, the State maintains that this court lacks subject matter jurisdiction over this appeal.

---

[3]She also asserted that her counsel, appointed pursuant to 25 U.S.C. § 1912, was ineffective and that her consent was obtained by fraud, see 25 U.S.C. § 1913(d), but she does not advance those arguments here and, therefore, neither do we.

Under the ICWA, state courts are courts of limited jurisdiction. *See State v. Native Village of Tanana*, 249 P.3d 734, 738-39 (Alaska 2011). The State's challenge to our jurisdiction fails, however, because it does not distinguish between jurisdiction to determine jurisdiction, which a court inherently possesses, *see Rosado v. Wyman*, 397 U.S. 397, 403 n.3 (1970) (noting "the truism that a court always has jurisdiction to determine its own jurisdiction"), and jurisdiction over the subject matter of the controversy, which, when absent, means the court "cannot decide the case on the merits." *In re Orthopedic Products Liab. Litigation*, 132 F.3d 152, 155 (3d Cir. 1997).

The State misinterprets *In re M.M.* to apply to the former while it concerns the latter. The *M.M.* appeals court held that it lacked jurisdiction to determine the merits of the transfer order, not that it lacked jurisdiction to determine whether the California district court had jurisdiction at the outset. 65 Cal. Rptr. 3d at 284. As such, *In re M.M.* is inapposite. *See Swan v. Swan*, 106 Nev. 464, 469, 796 P.2d 221, 224 (1990) (subject matter jurisdiction cannot be waived and may be raised in petition to vacate initial child custody order).

Second, seizing on the children's initial ineligibility for tribal membership, the State asserts that the district court's termination proceeding represented the continuation of the 2005 child welfare dependency proceedings and so was not even subject to the ICWA. This is incorrect. While the children may not have initially qualified for tribal enrollment, it was for the tribe to decide whether the children were enrollable, a question the tribe answered in the affirmative before the termination hearing occurred.[4] *See Matter of Petition of Phillip A. C.*, 122 Nev. 1284, 1291, 149 P.3d 51, 56 (2006) ("Whether a person is a member of a Native American tribe for ICWA purposes is for the tribe itself to answer . . . ."); *In re Dependency of E.S.*, 964 P.2d 404, 410 (Wash. Ct. App. 1998) (noting that a tribe "may determine at a point in time that a given child is not enrollable and later change its mind and determine that the child is enrollable," thus implicating the ICWA even in the middle of proceedings). Therefore, because the children became "Indian child[ren]" before the termination occurred, proceedings concerning their custody were and are subject to the

---

[4]We recognize that Raena ultimately relinquished her parental rights. For consistency, we will refer to the proceedings as termination proceedings. *See In re J.M.*, 218 P.3d 1213, 1216-17 (Mont. 2009) (under the ICWA, relinquishments that began as involuntary termination proceedings but yield a voluntary termination must still comply with the ICWA's involuntary termination procedures).

ICWA. *See* 25 U.S.C. § 1903(4) (defining "'Indian child'" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"); *see also id.* § 1903(1)(ii) ("termination of parental rights" proceedings within the ICWA's purview). Thus, the ICWA applies but, as discussed below, we determine that the district court's exercise of termination jurisdiction was proper under 25 U.S.C. § 1919.

## B.

The ICWA was enacted to counteract the large-scale separations of Indian children from their families, tribes, and culture through adoption or foster care placement, generally in non-Indian homes. *See Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 32 (1989); *Matter of Petition of Phillip A. C.*, 122 Nev. at 1295, 149 P.3d at 58-59. Surveys conducted in 1969 and 1974 by the Association on American Indian Affairs showed that 25 to 30 percent of Indian children were being separated from their families and that fully 85 to 90 percent of these children were being placed in non-Indian foster care, adoptive homes, or institutions. H.R. Rep. No. 95-1386, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531. These separations and placements were found to be largely unwarranted, resulting from a failure by child welfare services to understand the cultural differences in Indian child-rearing practices and other social and economic factors of Indian life. *Matter of Adoption of Crews*, 825 P.2d 305, 308-09 (Wash. 1992) (citing H.R. Rep. No. 95-1386, at 10-12, 1978 U.S.C.C.A.N. 7532-35).

The ICWA establishes "minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. Section 1911 creates a "dual jurisdictional scheme" for Indian child custody proceedings which was rooted in "pre-ICWA case law in the federal and state courts." *Holyfield*, 490 U.S. at 36, 42. Subsection (a) of section 1911 provides, in part, that "[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law."[5] If the child is a ward of the tribe, exclusive jurisdiction re-

---

[5] The exception in cases "where such jurisdiction is otherwise vested in the State by existing Federal law," 25 U.S.C. § 1911(a), is widely held to be a reference to Public Law 280 states (Minnesota, California, Wisconsin, Alaska, Nebraska, and Oregon), which obtained near-blanket jurisdiction over tribal affairs. Pub. L. No. 280, 67 Stat. 588 (1953) (codified as amended in 18 U.S.C. § 1162 (2006)).

sides with the tribe regardless of the child's residence and domicile. *Id.*

Subsection (b) is a relational provision for "concurrent but presumptively tribal jurisdiction," *see Holyfield*, 490 U.S. at 36; *Cohen's Handbook of Federal Indian Law* 829 (5th ed. 2005), which requires transfer of state court proceedings involving Indian children not "domiciled or residing within the reservation." 25 U.S.C. § 1911(b). This mandatory transfer may be derailed by objection of either parent, declination by the tribe, or good cause. *Id.*

Raena argues that, once the tribe's blood quantum requirements changed, section 1911(a) vested exclusive jurisdiction to determine their custody in the tribe. The children were "Indian child[ren]," 25 U.S.C. § 1903(4), and section 1911(a) gave the tribe jurisdiction over them, because the record shows that they were domiciled on the reservation (despite the State's contention that Raena was incarcerated off reservation). *Holyfield*, 490 U.S. at 48 (domicile for children is the domicile of their parents); *McCracken v. Murphy*, 328 F. Supp. 2d 530, 532 (E.D. Pa. 2004) (an inmate's domicile is the domicile before incarceration, unless the inmate intends to live elsewhere when he or she is released). Without more, the tribe would have had exclusive jurisdiction over the termination proceedings pursuant to section 1911(a).

But section 1911 is not the ICWA's only jurisdictional provision. Section 1919(a) authorizes states and tribes to "enter into agreements . . . respecting . . . jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for concurrent jurisdiction." The district court's exercise of subject matter jurisdiction over the relinquishment relied on section 1919(a). Thus, it specifically found: "Tribal Social Services and State Social Services were in agreement that the Termination of Parental Rights should proceed in State District Court and the placement and adoption of the children, if necessary, would proceed in the Tribal Court."

Here, DCFS, tribal social services, the state court, and the tribal court all agreed that the termination proceeding would conclude in Nevada state court, then be transferred to the tribal court for the adoption. Tribal social services and DCFS collaborated for years to ensure the necessary players stayed informed, and the district court diligently assessed the applicability of the ICWA at each step. When the children became eligible for tribal membership, the district court secured tribal approval before proceeding with the termination. Interim tribal social services director Melanie Arragon notified DCFS that the tribe was ready to move on the termination issue but wanted the state to complete what it had started.

As DCFS summarized: "A joint decision was made to continue with the Division of Child and Family Services maintaining jurisdiction with the Fallon Paiute Shoshone Tribal Social Services

being a co-agent and lending support"; "[u]pon a termination of parental rights hearing being set the Fallon Paiute Shoshone Tribal court will schedule a Status hearing to receive an update on what is occurring." All along, the tribal court recognized that the children were in concurrent "legal and physical custody" of the tribe and state and determined that the "current plan and placement of [the children] is appropriate and approved to address termination of parental rights . . . ." After the termination was complete, the tribal court recognized the cessation of concurrent jurisdiction on May 7, 2007, when it "accept[ed]" the transfer of jurisdiction and the district court ordered that "legal and physical custody of [the children] be returned to the Fallon Paiute Shoshone Tribal Social Services." The cooperation here and agreement for the state court to exercise termination jurisdiction can hardly be questioned; therefore, we reject Raena's argument that the record does not demonstrate that a section 1919(a) agreement to share jurisdiction was reached. In fact, it demonstrates the opposite, as the district court expressly found.[6]

Also unavailing is Raena's argument that the tribe had exclusive jurisdiction under section 1911(a) over the termination proceedings and could not share "exclusive jurisdiction" by a section 1919 agreement. Basically, Raena argues that section 1919 agreements are only available when concurrent state-tribal jurisdiction exists under section 1911(b). Without a state's foundational jurisdiction rooted in section 1911(b), she argues section 1919 cannot apply.

Raena's reading of the statutory scheme would require an implausible departure from its language. We " 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' " *BedRoc Limited, LLC v. United States*, 541 U.S. 176, 183 (2004) (alteration in original) (quoting *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253-54 (1992)). Thus, our inquiry begins with the statutory text and ends there, if the text is unambiguous. *BedRoc Limited*, 541 U.S. at 183. Neither the language of section 1919 nor that of section 1911 supports Raena's interpretation.

The language of section 1919 authorizes jurisdictional agreements for concurrent jurisdiction where it would not otherwise exist:

---

[6]While the record does not contain an executed agreement between the tribe and state, Raena points to no authority that such a writing is required. To add such a requirement would complicate section 1919's authorization of transfer and exercise of concurrent jurisdiction by cooperation on a "case-by-case" basis. *See Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg. 67,584, 67,585 (Nov. 26, 1979) (declining to set forth guidelines for case-by-case transfer of jurisdiction and jurisdictional agreements because guidelines would "impose on such agreements restrictions that Congress did not intend should be imposed").

> States and Indian tribes are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis *and agreements which provide for concurrent jurisdiction between States and Indian tribes.*

25 U.S.C. § 1919(a) (emphasis added).

As noted above, Raena urges us to interpret section 1919 to apply only to section 1911(b), *see supra* p. 22. Section 1911(b), though, covers scenarios in which states and tribes already have concurrent jurisdiction. *Holyfield*, 490 U.S. at 36. Adopting Raena's interpretation would render meaningless the "provide for" language in the last clause of section 1919, which commonly means "to make available." *Webster's New Universal Unabridged Dictionary* 1556 (1996). "This court generally avoids statutory interpretation that renders language meaningless or superfluous." *Karcher Firestopping v. Meadow Valley Contr.*, 125 Nev. 111, 113, 204 P.3d 1262, 1263 (2009); *see Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts must give effect, if possible, to every clause of a statute).

Section 1911(a)'s reference to the tribe having "exclusive jurisdiction" does not persuade us to adopt Raena's view. In permitting concurrent exercise of jurisdiction by agreement on a case-by-case basis, section 1919 represents the more specific of the two statutes. *In re Resort at Summerlin Litigation*, 122 Nev. 177, 185, 127 P.3d 1076, 1081 (2006) ("[W]here a general statutory provision and a specific one cover the same subject matter, the specific provision controls."). It permits concurrent jurisdiction that otherwise would not exist, *i.e.*, in which exclusive jurisdiction would otherwise exist. Thus, section 1919(a) permits tribes and states the freedom to coordinate jurisdiction consensually where, as here, such coordination is deemed best.[7] It would be improper to "impose on such agreements restrictions that Congress did not intend should be imposed." *Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed. Reg. 67,584, 67,585 (Nov. 26, 1979) (explain-

---

[7]Legislation permitting tribal-state agreements affecting jurisdiction is not unusual. *See* 25 U.S.C. §§ 2701-2721 (2006) (Indian Gaming Regulatory Act requires state-tribal agreements); *Cohen's Handbook of Federal Indian Law* 590 (5th ed. 2005) ("Because of federal supremacy over Indian affairs, tribes and states may not make agreements altering the scope of their jurisdiction in Indian country absent congressional consent" but may alter the scope of their jurisdiction with congressional consent.); *Kennerly v. District Court of Montana*, 400 U.S. 423, 429-30 (1971).

ing the BIA's decision not to provide guidelines to tribal-state agreements under section 1919).

Even assuming, arguendo, that Raena's reading of sections 1911 and 1919 identifies a colorable ambiguity in their text, her analysis still fails. While "[r]eliance on legislative history in divining the intent of Congress is . . . a step to be taken cautiously," *Piper v. Chris-Craft Industries*, 430 U.S. 1, 26 (1977), the ICWA's history confirms our reading of sections 1911(a) and 1919, not Raena's. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59-60 (1978) (employing Indian law canons of construction when statutory language is unclear). The ICWA evinces an inherent mistrust of state child custody adjudications involving Indian children, *Holyfield*, 490 U.S. at 44-45, but Congress was careful not to unduly burden tribal autonomy by substituting its judgment for the tribes', S. Rep. No. 95-597, at 18 (1977) (section 1919 "give[s] to states and tribes the broadest possible latitude in the types of agreements they may enter into"). Section 1919 preserves inherent tribal sovereignty to determine that state social services and courts—at least on a case-by-case basis—could be helpful. *Cohen's Handbook of Federal Indian Law* 120 (5th ed. 2005) ("[T]ribal . . . sovereignty [is] preserved unless Congress's intent to the contrary is clear and unambiguous"). In this case, where the children initially were not eligible for membership in the tribe then became eligible, self-determination and governance is best recognized by upholding the tribe's agreement to yield to state jurisdiction for the termination proceeding. Here, the tribe determined that Nevada courts were an appropriate forum to exercise jurisdiction over the termination proceedings and under section 1919 that determination was the tribe's to make. We therefore uphold the district court's jurisdiction over Raena's relinquishment of parental rights under 25 U.S.C. § 1919.

## C.

Raena next argues that the state court lacked jurisdiction because neither she nor the tribe received proper notice of the termination proceeding. She bases this argument on 25 U.S.C. § 1912,[8] which requires notice "by registered mail with return receipt requested"

---

[8]Though Raena relinquished her rights, the proceeding began as an involuntary termination and section 1912's notice provisions apply to proceedings that begin as involuntary terminations but result in voluntary terminations. *See, e.g., In re J.M.*, 218 P.3d at 1217-18 (holding that a proceeding which began as an involuntary proceeding but resulted in a voluntary termination needed to comply with section 1912 but not section 1913); *In re Welfare of MG*, 201 P.3d 354, 358 (Wash. Ct. App. 2009) (noting that mother's consent to dependency did not change the initial involuntary proceeding to a voluntary one).

to the Indian child's parent and tribe of the "pending [termination] proceedings and of their right of intervention."

This argument fails because both Raena and the tribe had actual notice of the termination proceeding.[9] Raena appeared and participated; the tribe approved of it, agreeing to the state court's exercise of jurisdiction. Though notice may not have been sent "by registered mail with return receipt requested," 25 U.S.C. § 1912(a), and the record does not include the document used to provide Raena's notice, "[w]hen actual notice of an action has been given, irregularity in the content of the notice or the manner in which it was given does not render the notice inadequate." Restatement (Second) of Judgments § 3 (1982); *see Matter of B.J.E.*, 422 N.W.2d 597, 599-600 (S.D. 1988) (actual notice sufficient where there was substantial compliance with the ICWA); *Matter of L.A.M.*, 727 P.2d 1057, 1060-61 (Alaska 1986) (actual notice renders compliance with section 1912's technical "registered mail with return receipt requested" requirements unnecessary) (dictum); *In re TM*, 628 N.W.2d 570, 575 (Mich. Ct. App. 2001); *Matter of Welfare of M.S.S.*, 936 P.2d 36 (Wash. Ct. App. 1997); *see also In re D.M.*, 685 N.W.2d 768, 771-72 (S.D. 2004) (holding that continuous contact between state social services and the tribe over seventeen months substantially complied with section 1912's notice of right to intervention requirement).

Accordingly, we affirm.

SAITTA, C.J., and DOUGLAS, CHERRY, GIBBONS, HARDESTY, and PARRAGUIRRE, JJ., concur.

---

[9]Raena argues that the court lacked jurisdiction because it did not comply with the notice provisions set forth in NRS 128.023, which in termination proceedings requires the district court to "[c]ause the Indian child's tribe to be notified in writing in the manner provided in the Indian Child Welfare Act." She correctly points out that the record does not contain a writing from the district court to the tribe. However, because Nevada's statutes reinforce the ICWA, under which actual notice to the tribe suffices, the tribe's actual notice from DCFS, rather than the district court, substantially satisfies NRS 128.023. *In re TM*, 628 N.W.2d 570, 575 (Mich. Ct. App. 2001) (technical failure in method of notice "does not invalidate the proceedings if actual notice was achieved through a comparable method"). Here, there is no indication that NRS 128.023 grants notice rights beyond those delineated by 25 U.S.C. § 1912. *International Game Tech. v. Dist. Ct.*, 122 Nev. 132, 153, 127 P.3d 1088, 1103 (2006) (when the Legislature patterns a statute after a federal statute we presume it intended the same construction and operation).