**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOAN R. MACK, as Trustee of the
Palace Jewelry & Loan Co., Inc.
401 (k) Profit Sharing Plan and
Trust,
            *Plaintiff-Appellee,*

                v.

RANDAL S. KUCKENMEISTER, CPA,
MST, as Administrator of the
Estate of Charla Marie Mack,
Deceased,
            *Defendant-Appellee,*


DARREN ROY MACK, an individual,
            *Defendant-Appellant,*

                and

JOHN DOES, 1 through 50,
inclusive,
            *Defendant.*

No. 09-15290

D.C. No.
3:08-cv-00370-ECR-
RAM

10565

Joan R. Mack, as Trustee of the
Palace Jewelry & Loan Co., Inc.
401 (k) Profit Sharing Plan and
Trust,
                    *Plaintiff-Appellant,*

                    v.

Randal S. Kuckenmeister, CPA,
MST, as Administrator of the
Estate of Charla Marie Mack,
Deceased; Darren Roy Mack, an
individual,
                    *Defendants-Appellees,*

                    and

John Does, 1 through 50,
inclusive,
                    *Defendant.*

No. 09-15291

D.C. No.
3:08-cv-00370-ECR-
RAM

OPINION

Appeals from the United States District Court
for the District of Nevada
Edward C. Reed, District Judge, Presiding

Submitted April 16, 2010*
San Francisco, California

Filed July 22, 2010

Before: A. Wallace Tashima and Sidney R. Thomas,
Circuit Judges, and William Stafford,
Senior District Judge.**

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable William Stafford, Senior United States District Judge
for the Northern District of Florida, sitting by designation.

Opinion by Judge Thomas

**COUNSEL**

Mark Wray, Law Offices of Mark Wray, Reno, Nevada, for defendant-appellant/cross-appellee Darren Roy Mack.

Todd A. Bader, Bader & Ryan Ltd., Reno, Nevada, for plaintiff-appellee/cross-appellant Joan R. Mack.

Ryan W. Herrick and Ann Morgan, Jones Vargas, Reno, Nevada, for defendant-appellee/cross-appellee Randal S. Kuckenmeister.

**OPINION**

THOMAS, Circuit Judge:

Darren Mack murdered his wife, Charla Mack, and shot the state court judge overseeing their divorce proceedings before a final written divorce decree could be filed. Believing Darren Mack and Charla Mack had agreed to the terms of their divorce before Charla Mack's murder, the Estate of Charla Mack filed a motion in state court for the divorce decree to be memorialized in an order dated *nunc pro tunc* to a time before her death. The Nevada district court entered a domestic relations order ("order" or "DRO") over Darren Mack's objection. Among other things, the DRO decreed that a Qualified Domestic Relations Order ("QDRO") should issue. Darren Mack appealed to the Nevada Supreme Court, which affirmed the judgment.

These appeals require us to determine whether state courts have subject matter jurisdiction to decide that a state court

issued domestic relations order is a QDRO as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 832, *as amended*, 29 U.S.C. § 1001 et seq. We conclude that they do and thus that the Nevada Supreme Court's QDRO determination in *Mack v. Estate of Mack*, 206 P.3d 98 (Nev. 2009), is entitled to full faith and credit. We reverse and remand with instructions for the district court to direct Joan Mack to deposit the contested funds with the court, if she has not already done so, and to award the funds to Randal Kuckenmeister, administrator of Charla Mack's Estate.[1]

I

Darren Mack and Charla Mack were engaged in divorce proceedings throughout 2005 and into the early part of 2006. As part of the divorce, Darren Mack agreed that the court would execute an order that would name Charla as the alternate payee of a 401(k) plan. The state court tasked Charla Mack's attorney with writing an order to that effect for the court's signature. Prior to the signing of the order, however, Darren Mack murdered Charla and shot the state court judge who was presiding over the divorce.[2] No written order was entered by the state court before Charla's death.

After Charla's death, her estate was granted permission to substitute for Charla in the remainder of the divorce proceedings. The estate moved for entry of an order *nunc pro tunc* that would memorialize what the estate saw as oral orders entered by the original divorce judge before Charla was

---

[1]We take judicial notice of *Mack* and related filings. *See Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir.1992) (court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

[2]Darren Mack has been convicted of Charla's murder and of attempting to murder the state district court judge. *See Mack*, 206 P.3d at 104.

killed. The motion was granted, and on June 20, 2007, the state court entered an order, *nunc pro tunc* as of January 9, 2006—a date when Charla was still alive—stating that "a QDRO will be executed which will transfer to Mrs. Mack the sum of five hundred thousand dollars with any appreciation that is distributed to that five hundred thousand dollars." Darren Mack appealed the order to the Nevada Supreme Court, where he argued, inter alia, that the order contravened federal law relating to retirement accounts.

While his state appeal was pending, Darren Mack threatened suit against the trustee of the 401(k) plan—his mother, Joan Mack—should she pay the benefit to Charla Mack's Estate. Joan Mack filed a complaint in federal court seeking to interplead the $500,000 in retirement money.[3]

Darren Mack answered the complaint and filed a cross-claim against the Administrator of Charla Mack's Estate, Randal Kuckenmeister, claiming the right to the $500,000.[4]

---

[3]Joan Mack's pleadings request declaratory judgment as to "the rights and obligations of the parties with respect to the retirement benefits." However, the complaint, which she labels "Complaint for Interpleader," citing Fed. R. Civ. P. 22(a)(1), also asks that "the Defendants be required to . . . settle between themselves their right to the retirement benefits" and requests that she "be discharged from any . . . further liability." At no point does she assert that the plan is not liable to pay the benefits to anyone, or seek adjudication of any dispute other than the dispute over the funds that she has sought to deposit with the court. Nor has a claimant to the stake asserted a counterclaim against her. She, the other litigants, and the district court have treated this as an interpleader case throughout the proceedings. Therefore, we consider her to be a disinterested stakeholder and construe her request for a declaration as to "the rights and obligations of the parties" as a request that she be declared discharged from further liability upon deposit of the interpleaded funds with the court.

[4]Darren Mack argues that what he labeled as a cross-claim was only an answer to Joan Mack's complaint and is not subject to dismissal. Darren Mack's filing in the district court is clearly labeled as both an answer and a cross-claim, clearly structured as such, and clearly includes the factual basis for his legal claim to the interpleaded funds. If his claim of entitlement is precluded by the Nevada court ruling, and we hold that it is, it is subject to dismissal no matter what it is called.

Kuckenmeister filed a motion to dismiss Joan Mack's complaint, and a second motion to dismiss Darren Mack's cross-claim. In both, he argued that the issue of who has the right to the pension funds mentioned in the state court order had already been resolved by the state court and that relitigation was barred by the doctrine of collateral estoppel. Joan Mack and Darren Mack argued that Joan Mack's complaint was not estopped because she had not participated in the Nevada court proceedings and was not in privity with Darren Mack. They also argued that while the state court did purport to determine who would be entitled to the retirement fund under state law, the issue before the federal court was whether that order was a QDRO under federal law.

The district court agreed with Kuckenmeister that "the issue to be decided in this case" was "the rights of the various parties with respect to th[e] retirement funds," which "is the same issue that was decided in the prior state court action." It found that because Joan Mack "as trustee of the retirement plan . . . has no independent interest as to which party . . . receives the retirement funds," her "interests were represented in the state court proceeding when the state court determined to execute the QDRO in favor of Charla." It therefore dismissed Joan Mack's complaint and Darren Mack's cross-claim as precluded by collateral estoppel. Darren Mack has appealed the dismissal of the complaint and the dismissal of his cross-claim. Joan Mack filed a cross-appeal regarding the dismissal of her complaint.

While the federal appeals were pending, the Nevada Supreme Court issued an opinion in the state court appeal. The opinion not only decided the validity of a *nunc pro tunc* domestic relations order under state law, but determined that the order was in fact a QDRO under federal law. *See Mack*, 206 P.3d at 109-10.

This appeal was briefed after the Nevada Supreme Court published its opinion. Darren Mack and Joan Mack maintain

that a state court lacks subject matter jurisdiction to determine whether an order issued in a domestic relations case is a QDRO, and therefore that its determination cannot be binding in a federal case. Even if a state court can have jurisdiction, they argue that the plan administrator must be given the first opportunity to evaluate an order and determine if it is a QDRO. They continue to argue that Joan Mack was not in privity with any party that participated in the state court proceeding, and thus that the state court decisions are not binding on her.

## II

"Under the federal full faith and credit statute, federal courts must give state court judgments the preclusive effect that those judgments would enjoy under the law of the state in which the judgment was rendered." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001) (citing 28 U.S.C. § 1738). Nevada applies "Nevada issue preclusion" to "determine the issue preclusive effect of a state decision." *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 718-19 (Nev. 2009).

> In Nevada, issue preclusion requires that (1) an issue be identical, (2) the initial ruling was final and on the merits, (3) the party against whom the judgment is asserted was a party or in privity with a party in the prior case, and (4) the issue was actually and necessarily litigated.

*Id.* at 718 (internal quotation marks omitted).

The preclusive effect of a prior judgment is a question of law reviewed de novo. *See Far Out*, 247 F.3d at 993. "The party seeking to assert a judgment against another has the burden of proving the preclusive effect of the judgment." *Bower*, 215 P.3d at 718.

As an initial matter, we reject Darren Mack's contention that he has raised any issue in federal court that was not

already litigated in state court. The question of whether the order was a QDRO was actually and necessarily litigated before the Nevada Supreme Court, as was the state court's subject matter jurisdiction to answer that question in the first instance. *See Mack*, 206 P.3d at 109 ("Darren [Mack] argues that in order for there to be a QDRO, the court must issue a domestic relations order (DRO) and the plan administrator must then determine if it is qualified."); *id.* at 109-10 (holding that "[w]hether a DRO constitutes a valid QDRO under ERISA is a question of law," which a state court can determine in the first instance by looking to the statutory requirements and underlying order (internal quotation marks omitted)); *id.* at 109 (reviewing the applicable statute).

This is not the end of our inquiry, however. Under Nevada law, a court judgment must be "valid" to have preclusive effect. *Exec. Mgmt., Ltd. v. Ticor Title Ins. Co.*, 963 P.2d 465, 473 (Nev. 1998). That is to say, the court must have personal and subject matter jurisdiction. Infirm judgments are not entitled to full faith and credit in federal courts. *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482-83(1982); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 386 (1996) (noting that state court judgments are binding only if the state court had power to enter the judgment). Judgments issued without authority are void as a matter of Nevada state law and, therefore, can have no preclusive effect under 28 U.S.C. § 1738. *Landreth v. Malik*, 221 P.3d 1265, 1267 (Nev. 2009). We must determine this issue independently. *See Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 607 (9th Cir. 1986) (a court must deny preclusive effect to a prior decision if the adjudicator lacked jurisdiction).

Therefore, we are called upon to decide whether or not a state court has jurisdiction to determine that a DRO is a QDRO, and whether there are any other jurisdictional requirements (such as exhaustion before the plan administrator or joinder of the plan administrator in the state court proceeding,

neither of which occurred in this case) before a state court may do so.

## III

### A

**[1]** ERISA states that "a court of competent jurisdiction" can determine whether a DRO is a QDRO. 29 U.S.C. § 1056(d)(3)(H)(i). The first question we must answer in this appeal, therefore, is whether a state court is "a court of competent jurisdiction" for these purposes. Like every court before us to consider this question, we answer this question in the affirmative.[5]

ERISA has a spendthrift provision that forbids a beneficiary from assigning or alienating his rights to pension plan benefits. 29 U.S.C. § 1056(d)(1). The statute also preempts state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). In the early days of ERISA litigation, courts were faced with the question of whether state court DROs that purported to transfer rights to ERISA pension funds to a plan

---

[5]*See Geiger v. Foley Hoag LLP Ret. Plan*, 521 F.3d 60, 67 (1st Cir. 2008); *Scales v. Gen. Motors Corp. Pension Adm'r*, 275 F. Supp. 2d 871, 876 (E.D. Mich. 2003); *Jones v. Am. Airlines, Inc.*, 57 F. Supp. 2d 1224, 1232 (D. Wyo. 1999); *Bd. of Trs. of Laborers Pension Trust Fund for N. Cal. v. Levingston*, 816 F. Supp. 1496, 1501 (N.D. Cal. 1993); *In re Marriage of Oddino*, 939 P.2d 1266, 1275 (Cal. 1997); *Robson v. Elec. Contractors Ass'n Local 134 IBEW Joint Pension Trust of Chi., Pension Plan No. 5*, 727 N.E.2d 692, 697 (Ill. App. Ct. 1999); *Eller v. Bolton*, 895 A.2d 382, 393 n.6 (Md. Ct. Spec. App. 2006); *Langston v. Wilson McShane Corp.*, 776 N.W.2d 684, 693 (Minn. 2009); *see also Hawkins v. CIR*, 86 F.3d 982, 987 (10th Cir. 1996) (assuming without deciding that a state court could have decided whether an agreement satisfied the statutory definition of a QDRO); Ronald J. Cooke, 2 ERISA Practice and Procedure § 2:23 (2d ed. 2003), at 2-157-2-158 ("In seeking enforcement of these orders, . . . a state court has concurrent jurisdiction to review a pension plan administrator's determination of whether a state court order is a qualified domestic relations order.").

participant's ex-spouse or children violated ERISA's spend-thrift clause or fell victim to the statute's preemption provision. Some courts held that the orders were unenforceable, while others read an exception into the two provisions of the statute and enforced the orders. *See Trs. of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 419 (9th Cir. 2000). Responding to this confusion, Congress enacted the Retirement Equity Act of 1984 ("REA"), Pub. L. No. 98-397, 98 Stat. 1426, which amended ERISA to permit state court ordered assignments of plan benefits to former spouses and dependents. *See* S. Rep. No. 98-575, at 19, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2565.

**[2]** As amended, ERISA now explicitly exempts from its anti-alienation and preemption provisions a subset of DROs. 29 U.S.C. §§ 1056(d)(3)(A), 1144(b)(7). To be exempt, such orders must be judgments, decrees, or orders "made pursuant to State domestic relations law" that "create[ ] or recognize[ ] the existence of an alternate payee's right to, or assign[ ] to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan." 29 U.S.C. §§ 1056(d)(3)(A), 1056(d)(3)(B). The REA also lists the few parties to whom a DRO may assign benefits, 29 U.S.C. § 1056(d)(3)(B)(I)(ii), the type and amount of benefits it may assign, 29 U.S.C. § 1056(d)(3)(D), and specific information that it must contain, 29 U.S.C. § 1056(d)(3)(C). Assuming a state court issues a DRO that substantially conforms to these requirements, it has issued a QDRO that creates enforceable interests in the proceeds of an ERISA plan. *Tise*, 234 F.3d at 420; *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1153 (9th Cir. 2000).

It is clear from this description that state family law, not ERISA, has created, recognized, or assigned the alternate payee's right to plan benefits. As we have explained in prior litigation, ERISA merely describes which state law created interests are enforceable in court. *See Tise*, 234 F.3d at 421 ("[A] QDRO only renders enforceable an already-existing

interest . . . .”). ERISA’s QDRO provision does not somehow create a right to plan benefits or create a right to enforce a state law order.

[3] The source and form of an alternate payee’s state law interest in pension benefits is critical to determining whether state courts can ever have jurisdiction to determine that a DRO is a QDRO. This is so because ERISA grants federal courts exclusive jurisdiction over most ERISA cases, including those where the plaintiff requests equitable relief to enforce provisions of ERISA or enjoin violations of the statute, while providing state courts with concurrent jurisdiction over cases brought “to recover benefits” or “to enforce . . . or to clarify” rights under the terms of the plan itself. 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3), 1132(e)(1). Because a DRO creates or describes a beneficiary’s right to benefits under an ERISA plan, a party named alternate payee in a DRO wishing to enforce, clarify, or collect on those rights first requires a determination that the rights are enforceable. Therefore, in the course of proceedings to enforce, clarify, or collect, a court may be called upon to determine whether or not the DRO is a QDRO. Because a state court has concurrent jurisdiction over these proceedings under 29 U.S.C. § 1132(a)(1)(B), *see Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 & n.2 (9th Cir. 1984), it follows that it has jurisdiction to decide the intermediate question of whether or not the DRO is a QDRO.

Joan Mack argues that the question of enforceability actually relates more closely to the actions for equitable relief and enforcement of statutory rights described in 29 U.S.C. § 1132(a)(3), over which federal courts have exclusive jurisdiction. We can imagine the case where the qualified status of a DRO must be litigated during the course of proceedings to enjoin a violation of ERISA or otherwise enforce the statute. Just because the question could arise in a case where the federal courts have exclusive jurisdiction, however, does not mean that a state court could not have concurrent jurisdiction

when it arises in a different context. *Cf. Carmona v. Carmona*, 603 F.3d 1041, 1051-52 (9th Cir. 2010) ("Although the present suit, as pleaded, arises under the exclusive jurisdiction of federal courts, when the parties proceeded initially, the state court had concurrent jurisdiction to hear the ERISA claim under 29 U.S.C. § 1132(a)(1)(B).").[6]

Joan Mack also argues that any lawsuit that incidentally requires a court to interpret a provision of ERISA falls within the federal courts' exclusive jurisdiction. She fails to cite a single case so holding, however, and we have not found one either. *See Menhorn*, 738 F.2d at 1500 & n.2 ("Congress granted the federal courts jurisdiction, in part exclusive, in part concurrent with state courts, over matters falling within ERISA's explicit provisions or this supplementary federal common law."). Determining whether or not a DRO falls within the QDRO exception to ERISA's anti-alienation provision requires no more interpretation of ERISA than determining whether a state law cause of action falls to ERISA's preemption provision, something that state courts are called on to do regularly. *See* Paul J. Schneider & Barbara W. Freedman, ERISA: A Comprehensive Guide § 8.07 (2d ed. 2003), at 8-44 n.236 (comparing state and federal court holdings regarding ERISA preemption); *cf. Marin Gen'l Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009) ("[A] defense of conflict preemption under [ERISA] § 514(a) does not confer federal question jurisdiction on a federal district court.").

Joan Mack also makes an argument based on ERISA's legislative history, citing a Conference Report that predates the REA and the federal court decisions that led Congress to

---

[6]Nor does it mean that a state court determination of the QDRO issue in a case where the state court had jurisdiction is anything but preclusive in a subsequent case, such as this one, where the federal courts have exclusive jurisdiction. *See* 29 U.S.C. §§ 1132(a)(1)(B), 1132(e)(1) (state courts do not have concurrent jurisdiction over suits brought by fiduciaries).

enact the REA. *See* H.R. Rep. 93-1280, at 68, *reprinted in* 1974 U.S.C.C.A.N. 5038, 5107. Because the Conference Report relates jurisdiction to the structure of the original statute and tells us nothing of the substantive intent of Congress, it is not persuasive regarding the amended statute. *See Bd. of Trs. of Laborers Pension Trust Fund for N. Cal. v. Levingston*, 816 F. Supp. 1496, 1499-1500 (N.D. Cal. 1993) (rejecting argument because of the date of the legislative history and because it "does not mesh with the plain language of § 1132(a)(1)(B)"); *In re Marriage of Oddino*, 939 P.2d 1266, 1272-73 (Cal. 1997) (same, and because, "[w]hile Congress clearly intended that actions to enforce rights *created* by ERISA's title I would be limited to federal courts, rights to benefits awarded in a QDRO are not derived from ERISA, but from state law and plan terms").

B

**[4]** Having decided that a state court has jurisdiction to determine whether or not a DRO is a QDRO, at least if it is doing so in the course of proceedings to "recover . . . , enforce . . . , or . . . clarify" benefit rights, we must now decide whether any other jurisdictional hurdles stand in the way of affirming the district court judgment. The next question, therefore, is whether or not the plan administrator needed to have been given the opportunity to determine if the DRO was a QDRO before the issue was decided by the state court. Because ERISA's administrative exhaustion requirement is prudential rather than jurisdictional, we answer that question in the negative.

Generally, before ERISA participants or beneficiaries can bring suit to recover plan benefits, they must exhaust a plan's internal claims procedure. *See* Paul J. Schneider & Barbara W. Freedman, ERISA: A Comprehensive Guide § 8.03[F] (3d ed. 2008), at 8-11 & n.52 (listing cases). Exhaustion is required for a variety of reasons, including "to help reduce the number of frivolous lawsuits under ERISA; to promote the

consistent treatment of claims for benefits; to provide a non-adversarial method of claims settlement; and to minimize the costs of claims settlement of all concerned." *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980). Because the exhaustion requirement is a creation of the federal courts, however, and is not written into the statute, it is a prudential rather than jurisdictional requirement. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008).

The REA explicitly contemplated the possibility of administrative exhaustion of the QDRO question. It requires pension plans to "establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." 29 U.S.C. § 1056(d)(3)(G)(ii). Any time that a DRO is "received by a plan," the plan must promptly notify the participant and alternate payee that it has received the order and of its procedure for determining the qualified status of the plan. 29 U.S.C. § 1056(d)(3)(G)(i)(I). "[W]ithin a reasonable period" thereafter, it must actually determine whether the order is a QDRO. 29 U.S.C. § 1056(G)(i)(II).

**[5]** Based on this language, we have assumed that a plan administrator should have the first opportunity to determine whether or not a DRO is a QDRO. *See Tise*, 234 F.3d at 421 ("Whether a state court's order meets the statutory requirements to be a QDRO, and therefore is enforceable against the pension plan, is a matter determined in the first instance by the pension plan administrator, and, if necessary, by a court of competent jurisdiction."); *see also Eller v. Bolton*, 895 A.2d 382, 393 n. 6 (Md. Ct. Spec. App. 2006); *Langston v. Wilson McShane Corp.*, 776 N.W.2d 684, 693 (Minn. 2009). This assumption is supported by the text of the statute, as well as our holdings with regard to ERISA administrative exhaustion generally.

**[6]** We have no reason to believe that this exhaustion requirement is jurisdictional where the others are prudential,

however. Nowhere do the REA amendments require exhaustion by their language. To the contrary, they merely require the plan administrator to take certain steps so that he will be prepared to evaluate DROs, and certain other steps if a DRO is actually "received." This is not to say that a state court should not consider whether and why a litigant has failed to present a DRO to the plan administrator before filing suit. It should.[7] We hold only that its failure to do so will not defeat a claim of issue preclusion in subsequent litigation.

## C

Having decided that a state court has jurisdiction to determine whether a DRO is a QDRO during the course of a civil action filed pursuant to 29 U.S.C. § 1132(a)(1)(B), and that administrative exhaustion is a prudential rather than jurisdictional requirement, we must now decide whether the state court here had jurisdiction. In this case, the QDRO determination was made by a state appellate court during the direct appeal of a family court order, wherein the plan participant raised ERISA's preemption provisions as a defense on the merits to entry of the order. We hold that the state court had jurisdiction in this context.

**[7]** State courts have jurisdiction to interpret and apply ERISA in certain cases other than "civil action[s]" filed under

---

[7]We recognize that the Nevada Supreme Court may have decided that exhaustion was not required in this case. *See Vaught*, 546 F.3d at 626-27 ("[T]here are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate."). The interwoven legal questions relating to *nunc pro tunc* domestic relations orders and ERISA are arguably more suitable for determination by a court of law than an administrator of pension benefits plan. Moreover, it could well have been futile for the Estate to go first to the plan administrator, who happens to be the participant's mother. Nonetheless, it would have been preferable for the Nevada courts to have conducted this analysis explicitly.

the statute. Of importance to our analysis here are conflict preemption cases. Section 1144(a) explains that certain subchapters of ERISA "supersede any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a). Where § 1144(a) is raised as a defense in a case that does not otherwise arise under ERISA, state courts retain jurisdiction over the case and over the preemption question. Moreover, the cases are not removable to federal court, even under the rule announced in *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987), that certain cases implicating ERISA are removable under an exception to the well-pleaded complaint rule. *See Marin Gen'l Hosp.*, 581 F.3d at 944 (distinguishing removable complete preemption cases from non-removable conflict preemption cases).

This is not the first time a court has been asked to address the question of state court jurisdiction in a case that does not fit comfortably in the § 1132(a)(1)(B) mold. In *Scales v. General Motors Corp. Pension Adm'r*, 275 F. Supp. 2d 871 (E.D. Mich. 2003), for example, after a plan administrator determined that a DRO was not a QDRO, the alternate payee named in the DRO filed a motion in her divorce case seeking an order to show cause why her former husband and the administrator of the pension plan should not be held in contempt for failing to comply with the DRO. *Id.* at 873. The administrator attempted to remove the case to federal court, arguing that the order to show cause was really a § 1132(a)(1)(B) "claim." *Id.* at 874. The federal district court held that the state court proceedings were not removable to federal court because ERISA was being invoked only "as a defense on the grounds that the [DROs] do not meet the requirements of a QDRO"; and that the state court had jurisdiction to determine whether a DRO was a QDRO even though the case was not a "civil action" as described in § 1132(a)(1)(B). *Id.* at 876-77.

The posture of this case is quite similar. Darren Mack raised the preemption provisions of ERISA as an affirmative

defense against the Estate's claim for a written, *nunc pro tunc* DRO. Darren Mack argued that the *nunc pro tunc* order was invalid because it was not a QDRO, and could never be perfected to become one, because ERISA does not permit pension benefits to be awarded to a deceased (as opposed to divorced) spouse. He also took issue with the use of Nevada's slayer statute to justify issuing a *nunc pro tunc* order, which Nevada family courts generally would not have the authority to do, arguing that such a construction of the slayer statute is preempted by ERISA.

[8] The Nevada Supreme Court rejected Darren Mack's first ERISA argument after determining that the initial oral order for the execution of a QDRO "created a recognized existence in Charla, the right to receive a portion of Darren's ERISA pension plan," during her lifetime. *Mack*, 206 P.3d at 109-10. It rejected his second ERISA argument as well, quoting a Second Circuit opinion that " 'laws of general application' "—such as the slayer statute—" 'whose effect on ERISA plans is incidental' " are not preempted by ERISA. *Id.* at 110 (quoting *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir. 1989)). The Nevada Supreme Court might have been able to address these arguments without actually determining that the DRO was a QDRO. Darren Mack does not argue that the state court determination was dicta and not entitled to full faith and credit, however, and Darren Mack is the one who argued that the order was not a QDRO, inviting the Nevada Supreme Court to decide otherwise.[8] We are not pre-

---

[8]In *Oddino*, a case similar to *Scales*, Mary, the alternate payee, first presented the DRO to the plan administrator, who determined that the DRO was a QDRO, but that it awarded a smaller portion of the benefits than Mary believed she was entitled to receive. Mary then returned to family court and sought an order requiring the plan to calculate the benefits as she had. The administrator objected, arguing that the state court did not have jurisdiction since Mary was, in effect, asking the court to enforce a provision of ERISA, which only a federal court may do. 929 P.3d at 1269. The California Supreme Court determined that the state court had jurisdiction to hear Mary's motion, which "is properly considered an action by a

pared to say that the court exceeded the scope of its appellate jurisdiction when it reached this issue.

**[9]** Therefore, we hold that the Nevada courts had jurisdiction to determine that the DRO was a QDRO.

## IV

In a ruling that was final and on the merits, the Nevada Supreme Court determined that the DRO was a QDRO, the exact issue that Darren Mack litigated there and wishes to relitigate here. That ruling is clearly binding against Darren Mack. We must also decide, however, whether it is binding on Joan Mack, and if not, what the proper course of action is to resolve Joan Mack's cross-appeal.

**[10]** Under Nevada state law, a party can only be barred from litigating an issue decided in a suit to which he was not party if he is "in privity with a party in the prior litigation." *Bower*, 215 P.3d at 718. "To be in privity, the person must have acquired an interest in the subject matter affected by the judgment through . . . one of the parties, as by inheritance, succession, or purchase." *Id.* (internal quotation marks omitted) (omission in original). Joan Mack is Darren Mack's mother and the trustee of his ERISA pension plan, but she has not somehow acquired his interest in his benefits, and thus she is not in privity with him under Nevada law.

The District Court erred when it held that "Plaintiff's interests were sufficiently represented in the state court proceed-

---

beneficiary to recover, enforce rights to, or clarify future benefits under the terms of a plan, within the meaning of section 1132(a)(1)(B)." *Id.* at 1271. While we agree with the court's sentiment—that it had jurisdiction, and that the case was more like a § 1132(a)(1)(B) action than a § 1132(a)(3) action—possible complications regarding federal court jurisdiction and removal counsel us to take this extra step to distinguish QDRO determinations made in the course of family law proceedings from those made in separate civil actions.

ings," reasoning that she, "as trustee, has no independent interest as to which party — Charla Mack or Darren Mack — receives the retirement fund." As the Nevada Supreme Court clarified in *Bower*, while this case was on appeal, this is an incorrect understanding of Nevada law. Nevada law does not permit estoppel by representation, but actually requires a type of privity that goes far beyond the relationship of a trustee and beneficiary.

It makes sense that Joan Mack would be permitted to litigate these issues anew. As trustee of the 401(k) Plan, Joan Mack owes a fiduciary duty not only to Darren Mack, but to the other plan participants. And she has a duty under ERISA to qualify domestic relations orders. If Joan Mack were to have filed an action for declaratory judgment, she would have been permitted to proceed notwithstanding a state court order regarding the same facts and issues that she wished to raise in federal court. *See Carmona*, 544 F.3d at 997. But she did not. She filed an action in interpleader, meaning that she has "effectively disclaim[ed] any position as to which of the claimants is entitled to the fund." *Tise*, 234 F.3d at 426; *see also Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 417 (6th Cir. 1997) (ERISA fiduciary dismissed from interpleader suit as soon as it deposited the contested funds with the court).

**[11]** Even though Joan Mack will be unable to challenge the state court's QDRO determination in any way, it was still error for the district court to dismiss the interpleader complaint, and certainly error for it to do so because of collateral estoppel.

Issue preclusion "applies to prevent relitigation of only a specific issue that was decided in a previous suit between the parties." *Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 714 (Nev. 2008). The requirement of privity is meant "to restrict the application of issue preclusion to parties whose due process rights have been met." *Bower*, 215 P.3d at 717. The mere fact that a party's substantive rights are not implicated by

applying the doctrine does not mean it is appropriate to apply it where the party has not yet been afforded the process due it by the courts.

**[12]** Nor could the district court have dismissed her complaint in interpleader on the grounds that there was no true conflict over the pension funds. A stakeholder may file an interpleader action to protect itself against "potential, as well as actual, claims." *Minn. Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 980 (9th Cir. 1999). Because Darren Mack has not actually disclaimed his right to the funds—and, to the contrary, asserted a right in both federal and state court—Joan Mack's interpleader action is proper.

As the Fifth Circuit explained succinctly in *Rhoades v. Casey*, 196 F.3d 592 (5th Cir. 1999):

> An interpleader action typically involves two stages. In the first stage, the district court decides whether the requirements for rule or statutory interpleader action have been met by determining if there is a single fund at issue and whether there are adverse claimants to that fund. Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 1714 (1986). If the district court finds that the interpleader action has been properly brought the district court will then make a determination of the respective rights of the claimants. *Id.*

*Rhoades*, 196 F.3d at 600. To hold at this stage that there is only one potential claim for the fund, this court first would need to understand "potential . . . claim[ ]" to mean a claim that a court will determine is not precluded by a prior court judgment. The purpose of interpleader is for the stakeholder to "protect itself against the problems posed by multiple claimants to a single fund." *Ensley*, 174 F.3d at 980. This includes protecting against the possibility of court-imposed liability to a second claimant where the stakeholder has

already voluntarily paid a first claimant. But it also includes limiting litigation expenses, which is not dependent on the merits of adverse claims, only their existence. *See Tise*, 234 F.3d at 426 ("Interpleader is a valuable procedural device for ERISA plans who are confronted with conflicting multiple claims upon the proceeds of an individual's benefit plan . . . [and who thus] risk[ ] defending against multiple lawsuits brought by the adverse claimants.").

For interpleader to be held improper based on the merits of the claims being asserted against the fund or stakeholder, courts would be required to address the merits of the claims before propriety of the interpleader. This is backwards of the usual order, and would defeat the resource-conservation purposes of interpleader. *See John Hancock Mut. Life Ins. Co. v. Kraft*, 200 F.2d 952, 954 (2d Cir.1953) (interpleader is not dependent on the merit of the defendants' claims).

V

Because the Nevada Supreme Court opinion does not preclude Joan Mack from arguing that there are multiple potential claimants to the fund, her complaint in interpleader should not have been dismissed. Rather, she should have been permitted to deposit the $500,000 with the court and then dismissed from the case, no longer having a legal interest in who had a right to the funds. At that point, Kuckenmeister's motion to dismiss Darren Mack's cross-claim could properly have been granted, leaving Kuckenmeister the sole claimant to the funds.

Therefore, we reverse the judgment of the district court and remand with instructions that Joan Mack be directed to deposit the contested funds with the court, if she has not already done so. Thereupon, the district court will dismiss Joan Mack from the case, dismiss Darren Mack's cross-claim, and enter judgment in favor of Kuckenmeister.

Each party is to bear its own costs on appeal and cross-appeal.

**REVERSED AND REMANDED WITH INSTRUC-TIONS.**